2021 IL App (1st) 182125-U

FIRST DISTRICT,
FIRST DIVISION
September 27, 2021

No. 1-18-2125

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 14 CR 04927 |
| | ) | |
| CESAR TORRES, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Hyman and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Evidence was sufficient to support defendant's conviction for first-degree murder and attempted murder. (2) Lineup was not so unduly suggestive that identifications should have been suppressed. (3) Anonymous tip testimony identifying defendant as the shooter was improper and prejudicial hearsay requiring reversal.

¶ 2    Following a jury trial, defendant Cesar Torres was convicted of the first-degree murder of Ricardo Herrera and the attempted first-degree murder of Dennis Chavez and Nick Mundo. On appeal, he argues that (1) the evidence was insufficient to convict him, (2) witness identifications

of him should have been suppressed since they were based on an unduly suggestive lineup, and (3) the trial court erred in admitting hearsay testimony that an anonymous caller identified defendant as the shooter. For the reasons that follow, we reverse and remand for a new trial.

¶ 3                                    BACKGROUND

¶ 4          On June 15, 2013, at around 10 p.m., Ricardo Herrera, Dennis Chavez, and Nick Mundo were walking from Chavez's house to a liquor store, Moreno's Liquors, approximately three blocks away. The lighting was "pretty good" because there were lots of streetlights and businesses. Chavez and Mundo both denied having anything to drink that night.

¶ 5          Chavez testified that as they neared the liquor store, he noticed a man, whom he identified in court as the defendant, pacing back and forth outside the store. As they got closer, defendant approached them and said, "What's up?" Herrera replied, "What's up?" Defendant then started shooting at them from around three to four feet away.

¶ 6          Chavez ran. From the distance of approximately two house lengths, he turned around and saw Herrera on the ground, saying, "Dennis, I'm hit." Chavez tried to run back to help him, but defendant fired at him again. Chavez took cover behind a car and watched as defendant walked over to Herrera, knelt down, and shot Herrera in the head. Chavez then ran back to his house.

¶ 7          Mundo testified that when defendant initially approached, "we weren't even paying attention to him. We were just talking amongst ourselves." Defendant said, "What's up?" and Herrera said, "What's up?" Defendant then reached for his gun and started shooting at all three men from "a couple of feet" away. Mundo ran. When he looked back, he saw defendant standing over Herrera, pointing his gun at him. Mundo continued running and did not stop until he reached Chavez's house.

¶ 8        Manuel Sanchez and Gerardo Trejo both lived in second-floor apartments across the street from Moreno's Liquors. At 10:45 p.m., Sanchez was awoken by the sound of a gunshot. Looking out the window, he saw a man standing across the street, holding something that "looked like a gun" and "stretching his arm down" toward someone lying on the ground in front of him. The man had short dark hair, a red shirt, and blue shorts, but Sanchez never saw his face. Trejo heard five or six gunshots, looked out the window, and saw a man with a red shirt and jean shorts holding a gun and shooting another man on the ground. Trejo described him as approximately 5'8" and 140 to 150 pounds but testified that it was difficult to see in the dark. Sanchez and Trejo were both unable to identify the shooter in a photo lineup.

¶ 9        Following the shooting, Herrera was pronounced dead on the scene. An autopsy revealed that he died from multiple gunshot wounds, including "a gunshot wound involving the brain," although none of the wounds showed evidence of close-range firing. Police recovered 12 cartridge cases from the scene, all of which had been fired from the same weapon.

¶ 10        While being treated at the hospital for gunshot wounds, Chavez and Mundo spoke with Detective David March. According to March's stipulated testimony, they both described the shooter as a male Hispanic in his early 20s, 5'6" to 5'8" tall, with a medium build, medium complexion, and medium-length black hair, wearing a red t-shirt and black shoes; Mundo added that the shooter had a mustache and goatee.

¶ 11        At trial, Mundo described the shooter as a "white complected" Hispanic with a fade haircut, in his early 20s, short, and wearing a red shirt, black shorts, and black shoes. Chavez described the shooter as around 5'4", with slicked-back hair, a red shirt, black shorts, and black shoes, but could not recall if he told detectives anything about the shooter's ethnicity or age.

¶ 12 Surveillance camera footage from Moreno's Liquors showed a Hispanic individual in a red shirt and black shorts outside the store around 11 p.m. On June 23, 2013, Detective James Decicco showed a still from the video to Chavez, who confirmed that the individual was the shooter.

¶ 13 On July 2, 2013, Decicco showed the surveillance video to Sergeant David Hickey, who recognized the individual in the surveillance video as a "gang subject" who went by the street name "Baby Ghost"—*i.e.*, defendant. He showed Decicco two photos of defendant for comparison, but Decicco made no attempt to arrest him at that time. According to Hickey, the shooting took place on the border between the territory of two rival gangs, the Two-Sixers and the Latin Kings.

¶ 14 Prior to hearing Decicco's testimony about receiving an anonymous tip in February 2014, the jurors received a limiting instruction from the trial court, as follows:

"Ladies and gentlemen, you're about to hear some testimony about some evidence that's going to be offered for the limited purpose of explaining the course of conduct by the Chicago Police Department. It is not to be considered by you in any way for the truth of the matter asserted. It is simply offered to explain the course of conduct towards the investigative actions by the Chicago Police Department and for that purpose only."

¶ 15 Decicco testified that he received an anonymous phone call on February 7, 2014, "pertaining to the homicide that occurred at 25th and Ridgeway in June. The person said that you might want to look at a person named Ghost. His first name is Cesar, and he lives in the area of 30th and Kenneth."

¶ 16 After receiving this information, Decicco obtained a photo of defendant and put together a photo array in which defendant was the only individual wearing a red shirt. On February 10,

2014, Decicco showed the photo array to Chavez, who identified defendant as the shooter. He also showed the photo array to Mundo, who was unable to make an identification and asked to see a lineup. The next day, Chavez posted on Facebook saying, "Detectives came looking for me. We may finally have justice for my homie Ricky." Mundo "liked" that post.

¶ 17       After defendant's arrest, Chavez and Mundo were asked by police to view a lineup. Before going to the police station, Chavez posted on Facebook that he heard "they caught that Two-Shit," and Mundo "liked" that post. Chavez testified that he made that post because he believed the shooter was likely a Two-Six gang member. Both Chavez and Mundo denied being Latin Kings, though Mundo admitted his Facebook username in 2014 was "Nick Dawgk," in which the "gk" stood for "Two-Six Killer."

¶ 18       The lineup consisted of defendant and four fillers. In choosing the fillers, Decicco attempted to find male Hispanics of the same approximate age, height, and weight as defendant. Two of the fillers had long ponytails; according to Mundo, the ponytails were "[a]lmost down to their bottoms" and they "looked like twin brothers." The other two fillers were 28 and 32 years old, and Mundo testified they appeared "much older" than defendant, who was 22. Both Chavez and Mundo identified defendant as the shooter in the lineup.

¶ 19       Defendant called Jesus Salazar, the program manager for the violence prevention department of Enlace Chicago, to testify about his participation in the program during the year preceding the shooting. On June 17 and 18, 2013, defendant attended a workshop for participants who showed "a decrease in street activity" and were ready for employment. Salazar testified that defendant always had his hair in a bald fade or a crewcut, never longer.

¶ 20       Defendant also called Dr. Deryn Strange, a cognitive psychologist, to give expert testimony "in eyewitness recall and problems that can be associated with it." She stated that a

witness's perception can be impaired by many factors, such as poor lighting, inattention (*e.g.*, being preoccupied by conversation, or paying attention to an assailant's weapon instead of his face), and alcohol consumption. According to Dr. Strange, Mundo's emergency room records indicated alcohol consumption, and there is a "precipitous drop-off" in the information that one remembers as time passes. Memory can be "pretty accurate" for "global features" such as an assailant's approximate height and shirt color, but is less accurate for "fine-grain details" such as facial characteristics. In addition, numerous studies have shown no correlation between witness confidence and accuracy.

¶ 21       Regarding the lineup, Dr. Strange testified that "[e]verybody should look sufficiently similar to the description given by the witness so that the identification procedure is a true test of memory." Lineups should not contain "biasing features" to make the suspect stand out, such as "clothing bias," which would be present in a lineup in which only the suspect is wearing clothing of a type that had been previously shown to the witness.

¶ 22       The jury found defendant guilty of first-degree murder of Herrera, attempted murder of Chavez and Mundo, and of personally discharging a firearm during the offenses. Defendant was sentenced to an aggregate term of 71 years in prison: 45 years for first-degree murder (including a 25-year firearm enhancement) and two concurrent terms of 26 years for attempted murder (each of which included a 20-year firearm enhancement).

¶ 23                                         ANALYSIS

¶ 24                               Sufficiency of the Evidence

¶ 25       Defendant first argues that Chavez and Mundo's identifications were not sufficiently reliable to prove him guilty beyond a reasonable doubt. When reviewing the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8

(2011). Rather, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Jackson*, 232 Ill. 2d 246, 280 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 26    The State's case largely rested on Chavez and Mundo's identifications. It is well established that a positive identification by a single eyewitness with ample opportunity to observe is enough to support a conviction. *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). "Normally, the [trier of fact] decides the weight that an identification deserves; and the less reliable the [trier of fact] finds the identification to be, the less weight the [trier of fact] will give it." (Internal quotation marks omitted.) *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 59 (appellate court declined to substitute its judgment for that of the trier of fact on reliability of eyewitness identification).

¶ 27    Under *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), in weighing the reliability of an identification, the trier of fact should consider the witness's (1) opportunity to view the offender at the time of the crime, (2) degree of attention, (3) accuracy of any prior description, (4) level of certainty, and (5) the length of time between the crime and the identification. Viewing the evidence in the light most favorable to the prosecution, as we must, we cannot say that no rational jury could have found defendant guilty.

¶ 28    First, although Chavez and Mundo's encounter with the shooter was brief, they had a clear, unobstructed, close-up view of his face as he approached and spoke to Herrera. In addition, they both testified that the area was well lit. See *People v. Hogan*, 388 Ill. App. 3d 885, 896-97 (2009) (resolving inconsistencies in the evidence is the province of the jury).

¶ 29 Second, Chavez, identified defendant in both a photo array and a lineup and testified that he first noticed defendant pacing back and forth in front of the liquor store, which he found to be "unusual." A rational jury could find this indicative of a high degree of attention. Moreover, contrary to defendant's argument that Chavez and Mundo were distracted by "weapon focus," they both testified to clearly observing the shooter before he opened fire.

¶ 30 Third, defendant's physical characteristics (Hispanic male, 5'6" and 185 pounds, 22 years old on the date of the shooting) are largely consistent with Chavez and Mundo's descriptions of the shooter. Despite minor discrepancies—for instance, Salazar testified that defendant had a bald fade or crewcut hairstyle, but March's stipulated testimony was that Chavez and Mundo described the shooter as having medium-length hair—it is well established that "[t]he presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made." (Internal quotation marks omitted.) *Tomei*, 2013 IL App (1st) 112632, ¶ 50; see also *People v. McTush*, 81 Ill. 2d 513, 522 (1980) ("minor discrepancy" in witness's description of shooter's clothing did not materially diminish reliability of identification).

¶ 31 Fourth, neither Chavez nor Mundo equivocated in their identifications of defendant. The jury was in the best position to judge their credibility and determine the weight to be given their testimony.

¶ 32 The final *Biggers* factor, the length of time between the crime and the identification, does not weigh in favor of reliability. About eight months elapsed between the shooting on June 15, 2013 and Chavez and Mundo's identifications of defendant in February 2014. Nevertheless, this time gap is not fatal to the State's case, and identifications made after longer periods of time have been upheld. See, *e.g.*, *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (identification

made 16 months later). Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found Chavez and Mundo's identifications to be reliable based on their opportunity to view the shooter, Chavez's high degree of attention, and their prior descriptions of the shooter.

¶ 33        Defendant additionally argues that Chavez and Mundo's identifications are not reliable because the lineup was unduly suggestive. As we shall discuss *infra*, the lineup was not so impermissibly suggestive as to violate the due process clause. Thus, arguments regarding suggestiveness in the lineup go to the weight of the evidence, which, as discussed, is the province of the jury.

¶ 34        Lastly, defendant argues that Chavez and Mundo's accounts of the shooting were not credible. We disagree. Chavez testified that he saw defendant walk over to Herrera, kneel down, and shoot him in the head. Sanchez and Trejo corroborated his account, testifying that they saw the shooter firing at, or stretching his arm towards, a victim on the ground in front of him. Herrera's autopsy similarly showed "a gunshot wound involving the brain," although the wound did not show evidence of close-range firing.

¶ 35        As for Mundo, although he gave inconsistent testimony as to whether the shooter was holding the gun in his right hand, he was still able to observe the shooter's face before the shooter drew his gun. In concluding that the evidence was sufficient to convict defendant beyond a reasonable doubt, we decline defendant's invitation to substitute our judgment regarding Chavez and Mundo's credibility for that of the jury. See *Jackson*, 232 Ill. 2d at 280-81; *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (it is well established that "[a] conviction will not be reversed simply because the defendant tells us that a witness was not credible").

¶ 36                    Chavez and Mundo's Lineup Identifications of Defendant

¶ 37         Defendant next argues that the lineup in which Chavez and Mundo identified him was unduly suggestive because he was the only participant matching the offender's description. We defer to the trial court's factual findings on a motion to suppress unless they are against the manifest weight of the evidence, but we review *de novo* the ultimate legal conclusion of whether suppression is warranted. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001).

¶ 38         When challenging the admissibility of a lineup, defendant bears the initial burden of showing the lineup was "so unnecessarily suggestive and conducive to irreparable misidentification" as to deny him due process of law. *People v. Jones*, 2017 IL App (1st) 143766, ¶ 28. If defendant makes such a showing, the burden shifts to the State to present clear and convincing evidence that "the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime." (Internal quotation marks omitted.) *McTush*, 81 Ill. 2d at 520.

¶ 39         It is well established that participants in a lineup need not be identical, and differences in their appearance go to the weight of the identification, not its admissibility. *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007). Although fillers should not appear "grossly dissimilar" to the suspect, they do not need to be "identical or near identical." (Internal quotation marks omitted.) *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 25. Here, all the lineup participants were Hispanic males of approximately the same height and weight with similar, nondescript clothing. They had dark hair and similar facial hair (a mustache and/or goatee). Although two of the fillers were 28 and 32 years old—*i.e.*, older than the 22-year-old defendant—we do not find this age gap so wide that it is "conducive to irreparable misidentification" (*Jones*, 2017 IL App (1st) 143766, ¶ 28).

¶ 40    More concerning is the fact that two of the fillers had long ponytails and, according to Mundo's trial testimony, "looked like twin brothers." Those fillers were notably dissimilar to the other lineup participants because hair reached "[a]lmost down to their bottoms." Nevertheless, since the other three lineup participants were viable choices for identification, the lineup was not so unduly suggestive as to violate defendant's due process rights.

¶ 41    *People v. Maloney*, 201 Ill. App. 3d 599 (1990), and *People v. Boyd*, 22 Ill. App. 3d 1010 (1974), on which defendant relies, are readily distinguishable. In *Maloney*, the fillers were well-groomed and dressed in clean, pressed shirts and pants, while defendant wore wrinkled and soiled clothes, had uncombed hair, appeared unkempt and disheveled, and was significantly smaller than the fillers. *Maloney*, 201 Ill. App. 3d at 606-07. Given these disparities, "[t]he lineup procedure in this case all but hung a sign saying 'pick me' around defendant's neck." *Id.* at 607.

¶ 42    In *Boyd*, victims of a robbery described the robbers as "Indians." The lineup was unduly suggestive where "[t]he defendants were the only Indians in the room and all the other people were physically dissimilar. The only people in the room wearing clothing similar to that described by the complaining witness were the defendants." *Boyd*, 22 Ill. App. 3d at 1018.

¶ 43    In contrast to *Maloney* and *Boyd*, the lineup participants in the instant case all had the same ethnicity, similar builds, and were similarly clothed. Defendant was not "spotlighted" by the composition of the lineup where, under the totality of the circumstances, the subjects had more in common than not.

¶ 44    *People v. Clifton*, 2019 IL App (1st) 151967, on which defendant also relies, is similarly inapposite. In *Clifton*, defendant robbed several victims at gunpoint. The victims described him to police as having dreadlocks and wearing a dark hoodie, jogging pants, and white gym shoes.

*Id.* ¶¶ 5-10. The next day, police arrested defendant, who was in possession of one of the victims' cell phones and was still wearing the same clothes worn during the robbery. Defendant was the only participant with dreadlocks, a dark hoodie, jogging pants, and white gym shoes in the subsequent lineup. Since only defendant had "the precise combination" of several features described by the victims, we found the lineup to be unduly suggestive. *Id.* ¶ 69.

¶ 45    In the instant case, multiple lineup participants fit the description given by the victims, in that they were Hispanic males with medium-length dark hair, similar builds, and in a similar age range as defendant. Accordingly, the trial court did not err in denying defendant's motion to suppress identification.

¶ 46                    Evidence Regarding the Anonymous Tip

¶ 47    Finally, defendant argues that the trial court erred in allowing Decicco to testify that an anonymous tipster identified him as the shooter, because it was inadmissible hearsay and violated his sixth amendment right to confront adverse witnesses. The State argues that Decicco's testimony was proper to explain the course of the criminal investigation.

¶ 48    Hearsay, defined as an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible. Ill. R. Evid. 801(c), 802 (eff. Jan. 1, 2011). Conversely, if an out-of-court statement is offered for some other purpose, it is not hearsay and is admissible. *People v. Kliner*, 185 Ill. 2d 81, 150 (1998). An officer may testify about his conversation with a witness when such testimony is not offered to prove the truth of the matter asserted but to show the investigative steps taken by the officer. *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 41. But such testimony may not go beyond what is necessary to explain the officer's actions. In particular, an officer may not testify to the contents of a conversation going to "the very essence of the dispute," *i.e.*, defendant's guilt. *People v. Jones*, 153 Ill. 2d 155, 160 (1992); accord

*Ochoa*, 2017 IL App (1st) 140204, ¶ 41 (collecting cases). In such a situation, the officer may testify that a conversation occurred, but may not reveal its substance, even if the jury may draw a logical inference as to what was said. *Jones*, 153 Ill. 2d at 160; see also *People v. Gacho*, 122 Ill. 2d 221, 248-49 (1988) (officer could properly testify that after speaking to the victim, he went to look for defendant; however, it would have been inadmissible hearsay if the officer testified that the victim identified defendant as the one who assaulted her).

¶ 49　　　*People v. Jura*, 352 Ill. App. 3d 1080 (2004), and *People v. Singletary*, 273 Ill. App. 3d 1076 (1995), are instructive. In *Jura*, officers received a radio call about an armed six-foot-tall white male with a teardrop tattoo on his face. *Jura*, 352 Ill. App. 3d at 1082. When the officers arrived on the scene, they saw defendant, who matched the description, throwing a gun into a garbage can. Defendant was arrested and convicted of unlawful use of a weapon by a felon.

¶ 50　　　We held that it was reversible error for the officers to testify about the contents of the radio call, which "fail[ed] to satisfy any relevant nonhearsay purpose." *Id.* at 1086. We explained that "[t]he prosecution merely needed to demonstrate that the officer[s were] on duty, received a radio call, and as a result of that call proceeded to the alley behind 38th Street." *Id.* Instead, the officers "went beyond explaining the investigative steps taken by testifying to the substance of the radio call, including the description of the offender." *Id.*

¶ 51　　　In *Singletary*, an officer testified that he received a tip from a confidential informant that defendant was going to a certain address to pick up a package of cocaine. *Singletary*, 273 Ill. App. 3d at 1082. The informant also gave a description of defendant and his car. *Id.* We found that it was reversible error to permit the officer to present the substance of his conversation with the informant, because it went beyond what was necessary to explain his actions. *Id.* at 1084.

¶ 52        Here, as in *Jura* and in *Singletary*, Decicco's testimony went beyond what was necessary to explain his actions. Decicco only needed to explain that he received an anonymous phone call, after which he assembled a photo lineup that included defendant's picture. Instead, he went beyond that and testified to the substance of the phone call, which, in context, clearly implicated defendant in the shooting, "the very essence of the dispute" (*Jones*, 153 Ill. 2d at 160). Based on *Jones* and *Gacho*, Decicco's hearsay testimony was improperly admitted.

¶ 53        The anonymous tip testimony also violated defendant's right to confront his accusers under *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* held that the confrontation clause of the sixth amendment bars "testimonial" hearsay statements from being admitted against a criminal defendant unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 53-54. A statement is testimonial if, "viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). Here, the State does not contend that the anonymous tip was not testimonial, nor could it reasonably do so, since it was a statement made to an officer in an ongoing criminal investigation. See *Davis v. Washington*, 547 U.S. 813, 822 (2006). Admitting the contents of the anonymous tip violated defendant's right to confront his accusers.

¶ 54        The State argues that any error in admitting Decicco's testimony was cured by the judge's limiting instruction to the jury not to consider the anonymous tip as substantive evidence. We rejected this same argument in *Singletary*, finding that "the admission of the prejudicial statements was not cured by a limiting instruction 'because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extra-judicial statements in determining the petitioner's guilt.' " *Singletary*, 273 Ill. App. 3d at 1086 (quoting *Bruton v.*

*United States*, 391 U.S. 123, 126 (1968)); see also *People v. Shorty*, 408 Ill. App. 3d 504, 511-12 (2011) (limiting instruction could not cure error in admitting hearsay testimony that informant told police that defendant was on his way to Chicago to pick up heroin). As our supreme court has stated, "To suggest that the jury disregard such explosive evidence is *** a recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." (Internal quotation marks omitted.) *People v. Hernandez*, 121 Ill. 2d 293, 318 (1988).

¶ 55    The State also argues that any error was harmless beyond a reasonable doubt because the evidence against defendant was overwhelming. In assessing whether the error was harmless, we must consider "whether there is a reasonable probability that the trier of fact would have acquitted the defendant had the hearsay been excluded." *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 37. Here, although the evidence was sufficient to convict defendant, there are multiple reasons why the jury may have found Chavez and Mundo's identifications unreliable: (1) they only had a brief opportunity to observe the shooter, a stranger, before he started firing; (2) the shooting occurred at night, and Trejo testified it was dark and difficult to see; (3) Mundo admitted that he was not paying attention to the shooter as he approached; and (4) approximately eight months lapsed between the shooting and the identifications. Accordingly, there is a reasonable probability that the jury would have acquitted the defendant if the hearsay evidence had been excluded.

¶ 56                                     CONCLUSION

¶ 57    For the foregoing reasons, we reverse the judgment of the trial court and remand for a new trial.

¶ 58    Reversed and remanded.